C. K. McCAN, Jr., et al., Appellants,

v.

MISSOURI PACIFIC RAILROAD COMPANY, Appellee.

No. 987.

Court of Civil Appeals of Texas, Corpus Christi.

Aug. 29, 1975.

Joseph P. Kelly, Victoria, for appellants.

James N. Stofer, Victoria, for appellee.

OPINION

NYE, Chief Justice.

This is an appeal from an order granting a temporary injunction. Plaintiff Missouri Pacific Railroad Company sought injunctive relief against the defendants, seeking the use of two specific tracts of land, belonging to defendants, for salvage and rebuilding operations of their trestle and derailed railroad cars, and further seeking to restrain defendants from interfering with the Railroad's use of defendants' land while such salvage and rebuilding operations were in progress. The trial court granted a prohibitory injunction, and other relief. The injunction expired fifteen days later by its own terms. The defendants have perfected their appeal from the orders of the trial court.

The plaintiff Missouri Pacific Railroad Company (hereafter referred to as Railroad) operated a main line which runs from Houston to Brownsville, Texas, which crosses Victoria County and other surrounding areas. The line runs across the defendants' ranch (called the McFaddin Ranch) on which the Railroad has a one hundred (100) foot right-of-way, fifty feet on each side of the center line of the railroad tracks.

On March 19, 1975, at approximately 5:45 o'clock p. m., a bridge located over the Guadalupe River on the defendants' ranch collapsed resulting in the derailment of eighteen of the Railroad's approximately 123 freight cars. The train had originated in Houston and was going to Brownsville, Texas.

According to the testimony of the engineer of the freight train in question, he noticed a small amount of smoke coming up between the ties near the south end of the bridge as his train approached the bridge. As he got more or less directly over the area where the smoke was rising, he saw a fire and small flames down below the ledge of the deck of the bridge. The engineer radioed to the caboose, informing the crew of what he had discovered.

The engineer decided to continue his train on south, as he was already over the fire, and pull the rear end of the train just south and past the fire, and stop the train so that the crew members on the rear of the train could extinguish the fire. After proceeding forward, the engineer stopped too soon leaving two cars, the caboose and the car next to the caboose, still over the bridge where the fire was.

The crew in the caboose notified the engineer of the position of the last two cars. The engineer then attempted to take up

slack and proceed on south far enough so that the caboose would clear the bridge and the fire. Because the train was on an ascending grade and because of the tonnage he had in his train, the engineer was unable to make the train go forward. The engineer then decided that he would make a reverse movement, or back the train approximately half of the train length and then make a run at the ascending grade. When the engineer backed up the train, it was necessary to come to a stop before again proceeding forward. This made necessary the application of the air brakes on the train. There was some two to three minutes delay in the brakes releasing on all of the cars before the engineer could start a south forward movement again. When the engineer attempted to move forward, the air hose, that is used to connect each freight car to the braking system, on one of the cars sitting on the bridge, caught fire and melted, causing an air leak resulting in the brakes locking on the entire train. The train in this condition was unable to move either forward or backward.

Covering the bridge at that time were some eighteen railroad hopper cars located approximately in the middle of the train. The fire got worse to the point that the bridge collapsed causing the eighteen railroad hopper cars to fall to the side of the collapsed bridge. All the railroad cars landed within the plaintiff's right-of-way area. Salvage operations were begun almost immediately thereafter by the Railroad.

It was determined by the Railroad that salvage of the hopper cars and the repair of the bridge could be done more expeditiously by the use of defendants' land adjacent to the bridge area. The Railroad then attempted to get permission from defendants for the use of a certain amount of defendants' land in order to get salvage and bridge building equipment to the derailment scene. During the negotiations, the defendants agreed to the Railroad's use of defendants' land and roads but only if the Railroad would agree to certain conditions, those being: 1) to pay all back claims for damages that the defendants had against Railroad (this was for cattle that were killed on the railroad right-of-way); 2) rebuild the fences along both sides of the Railroad's right-of-way, which consisted of approximately ten to twelve miles on each side; and 3) agree to build a spur track called for in an original right-of-way agreement. The Railroad refused and began salvage operations anyway which included moving the derailed cars off the Railroad's right-of-way onto the defendants' land. This was done, according to the testimony, so that the repairs to the bridge could be done in a more efficient and convenient manner.

Shortly thereafter, on March 20, 1975, some of defendants' employees approached the salvage and rebuilding site and instructed the Railroad's employees to get off and stay off their property, and to remove their cars, scrap rail and tracks off the defendants' property and back onto their own right-of-way. Defendants' employees ordered the Railroad's employees not to come on their property again. The defendants' employees were armed with guns at that time.

The next day, the Railroad sought injunctive relief seeking court permission to use two tracts of land belonging to defendants for their salvage and rebuilding operations. Additionally, the Railroad sought a temporary restraining order, restraining defendants from interfering with the Railroad's salvage and rebuilding operations. The two tracts of land requested by the Railroad were a 400' by 100' area immediately west of the Railroad's bridge and right-of-way and a 600' by 30' area immediately south of the property. Both of the tracts are located on the McFaddin Ranch, defendants' property. The trial court granted the temporary restraining order on March 21, 1975, to be effective until March 26, 1975, at which time a hearing was set for defendants to show cause, if any, why a temporary injunction should not issue against them.

On March 31, 1975, after an evidentiary hearing, an order granting an injunction was entered by the trial court. The order enjoined and restrained the defendants from interfering with the Railroad's salvage and rebuilding operations and it granted to the Railroad the use of defendants' property for such operation. The injunction was to expire by its own terms on April 12, 1975, at midnight. In addition to the injunctive relief ordered, the trial court ordered the Railroad to pay to defendants the sum of $2,200.00 for all back claims for cattle killed by the Railroad on its right-of-way through the McFaddin Ranch. The trial court further ordered that a commission be appointed to assess damages, if any, to the surface of defendants' land and ordered the Railroad to pay the sum so assessed by the commissioners as damages, if any, to the defendants. From that judgment, defendants have perfected their appeal to this Court.

The defendants bring forward three points of error on appeal. Since all these points are concerned with the issuance of the injunction, they will be discussed together. Defendants' points are as follows:

## Point No. 1

The order appealed from was clearly erroneous and was an abuse of and actually outside the power and jurisdiction of the court, because the railroad's pleadings not only revealed no right whatsoever to use defendants' property, but showed that it was seeking to obtain the use of private property in a manner contrary to the constitution and statutes of this State.

## Point No. 2

The order appealed from was clearly erroneous and an abuse of discretion, because the railroad's pleadings showed that it was attempting to obtain complete relief by the injunctive process and to destroy rather than preserve the status quo existing at the time.

## Point No. 3

The order appealed from was clearly erroneous, and an abuse of discretion and was void, because the railroad's pleadings showed that defendants were in peaceable, rightful possession of their own property, and the effect of the order was to transfer the possession and use of it to the railroad.

The general rule of law in Texas is that a trial court is clothed with broad discretion in determining whether to issue, or not, a temporary injunction to preserve the rights of the parties pending a final trial of the case. When that discretion is exercised, it should not be overturned on appeal unless the record discloses a clear abuse of discretion. *Texas Foundries, Inc. v. International Moulders & Foundry Workers' Union,* 151 Tex. 239, 248 S.W.2d 460 (1952); *Long v. Castaneda,* 475 S.W.2d 578 (Tex.Civ.App.—Corpus Christi 1971, writ ref'd n. r. e.); *Turner v. Cook,* 502 S.W.2d 824 (Tex.Civ.App.—Corpus Christi 1973, no writ); *City of Waco v. Earhart,* 511 S.W.2d 549 (Tex.Civ.App.—Waco 1974, writ ref'd n. r. e.). The right threatened and sought to be protected by injunction must be an existing one; it must be vested in the applicant; and it must be a legally cognizable and justiciable right or interest. 31 Tex.Jur.2d, Injunctions § 19 (1962); *Garland v. Shepherd,* 445 S.W.2d 602 (Tex.Civ.App.—Dallas 1969, no writ); *Hammon v. Wichita County,* 290 S.W.2d 545 (Tex.Civ.App.—Fort Worth 1956, no writ).

The Railroad had no right to enter upon and use the land belonging to the defendants outside of the Railroad's right-of-way, other than any rights they could acquire under Articles 6336 and 6337. Tex.Rev.Civ. Stat.Ann. Article 6336 provides for condemnation procedures to be exercised by the Railroad if the landowner and Railroad are unable to agree to terms for the purchase of real estate or materials thereon. Article 6337 provides:

"No railroad company shall enter upon, except for a lineal survey, any real estate

whatever, the same being private property, for the purpose of taking and condemning the same, or any material thereon, *for any purpose whatever,* until the said company shall agree with and pay the owner thereof all damages that may be caused to the lands and property of said owner by the condemnation of said real estate and property, and by the construction of such road." (Emphasis supplied.)

■ Since the Railroad plead no vested right belonging to it, did not seek condemnation, did not offer to pay defendants all damages caused to their land, and did not attempt to show a right to any equitable relief through the injunctive process, the trial court's order was erroneous and as such was an abuse of discretion.

In *Transport Co. of Texas v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, our Supreme Court said:

"In a hearing on an application for a temporary injunction the only question before the court is the right of the applicant to a preservation of the status quo of the subject matter of the suit pending a final trial of the case on its merits."

■ The purpose of a temporary injunction is to preserve or maintain the status quo in regard to the matter in controversy and not to determine the respective rights of the parties under the cause of action asserted or defenses or counterclaims urged. *Transport Co. of Texas v. Robertson Transports, Inc.,* supra; *Bedford v. Plum,* 497 S.W.2d 534 (Tex.Civ.App.—Tyler 1973, writ ref'd n. r. e.); *Nicholson v. National Motor Club of Texas, Inc.,* 498 S.W.2d 264 (Tex.Civ.App.—Tyler 1973, writ ref'd n. r. e.); *Langford v. Kraft,* 498 S.W.2d 42 (Tex.Civ.App.—Beaumont 1973, writ ref'd n. r. e.).

The status quo to be preserved by a temporary injunction is the last actual, peaceable noncontested status which precedes the pending controversy. *Bedford v. Plum,* supra; *Langford v. Kraft,* supra; *Brady v.*

*Servisoft, Inc.,* 338 S.W.2d 189 (Tex.Civ. App.—San Antonio 1960, writ ref'd n. r. e.); *Whitaker v. Wilson,* 349 S.W.2d 753 (Tex. Civ.App.—Houston 1961, writ ref'd n. r. e.). See also Lowe & Archer, Injunctions and Other Extraordinary Proceedings, Sections 327, 328 (1957). Obviously, that last peaceable, noncontested status of the parties was that time *prior* to the Railroad's moving their derailed railroad cars and heavy equipment off their right-of-way onto the defendants' property.

■ It is clear that the short termed injunction entered by the trial court on March 31, 1975, extending the temporary restraining order of March 21, 1975, did not in any way purport to preserve the status quo between the parties. Its effect was to ultimately decide and impose a right of possession of defendants' property in the hands of the Railroad without condemnation or other legal means. The court's order in the case at bar attempted to answer all of the ultimate issues as to the parties' rights without compliance with the law for such cases. Complete relief was afforded to the Railroad. This was clearly shown by the record. The court was without authority to divest the defendants of their property rights without a proper trial on the merits and its attempt to do so was void. See *James v. E. Weinstein & Sons,* 12 S.W.2d 959 (Tex.Comm'n App.1929, holding approved). See also *Taylor v. Cameron County Fresh Water Supply District Number One,* 361 S.W.2d 476 (Tex.Civ.App.—San Antonio 1962, no writ); *Galveston & W. Ry. Co. v. City of Galveston,* 137 S.W. 724 (Tex. Civ.App.—Galveston 1911, no writ); Lowe, Injunctions and Other Extraordinary Proceedings. It is equally well settled that a temporary injunction will be dissolved if it is based upon an erroneous application of the law to the facts. *Dallas General Drivers, etc. v. Wamix, Inc., of Dallas,* 156 Tex. 408, 295 S.W.2d 873 (1956).

■ There appears to be a further reason why the injunctive relief that was granted to the Railroad was improper. The record

shows that the need for the use of defendants' land was primarily for convenience sake, rather than for a real necessity or for prevention of an irreparable injury. Mr. Leon Miller, assistant general manager of plaintiff, Missouri Pacific Railroad Company, testified that it would take about three days to a week longer in restoring service if they were not permitted the use of defendants' property (outside their right-of-way). He admitted that he did not know of any loss of contracts due to the disruption of service. With respect to the service being disrupted over its main line, Mr. Miller stated that his Railroad had made arrangements with the Southern Pacific Railroad Company which would allow their trains to detour over Southern Pacific's line from either Sinton or Placedo, Texas. After reviewing all of the evidence, it does not appear that the Railroad would have suffered irreparable injuries and damages as would in any respect require immediate action by the trial court in granting the Railroad the use of defendants' property.

■ The defendants further attack the validity of the court's order with respect to certain extra orders within the decree that were issued in addition to the injunction. On March 28, 1975, at the evidentiary hearing before the trial court on the Railroad's application for temporary injunction and after presentation of all of the evidence, the trial court granted the injunction. In addition, the trial court went further and ordered the Railroad to pay to the defendants the sum of $2,200.00, for certain back claims (completely unrelated to the injunctive matter), and further, appointed commissioners to assess damages to defendants' land occasioned by the Railroad's use thereof. The court ordered the Railroad to pay the defendants the sum of money so assessed by the commissioners. There is no basis that we know of that would permit the trial court to enter such orders. After reviewing the pleadings we find that neither party pled for such relief nor requested the same. Even the Railroad joins with the defendants in attacking that portion of the order

granting the defendants judgment for $2,200.00 for back claims and the appointment of commissioners. Both parties agree that there were no pleadings to support such an order.

■ It is well settled law that a court may not grant relief not supported by pleadings or prayer. *Starr v. Ferguson,* 140 Tex. 80, 166 S.W.2d 130 (Tex.Comm'n App. 1942, opinion adopted); *Board of Firemen's Relief and Retirement Fund Trustees of Harris County v. Stevens,* 372 S.W.2d 572 (Tex.Civ.App.—Houston 1963, no writ); 34 Tex.Jur.2d, Judgments § 319 (1962). Here, the relief requested by the Railroad was strictly limited to an injunction. The defendants in their answer to the requested injunctive relief did not ask that damages be assessed nor did they make any request that a commission be set up to ascertain their damages, if any.

The defendants' points of error are sustained. The temporary injunction is dissolved. All other relief granted by the trial court is set aside. Costs are adjudged against the Railroad.

The judgment of the trial court is reversed and rendered.